650 So.2d 1227 (1995)
Angelica M. DAVID, a/k/a Angel David
v.
FIRST NATIONAL BANK OF COMMERCE.
Jackie KEHOE
v.
FIRST NATIONAL BANK OF COMMERCE.
Nos. 94-CA-1724, 94-CA-1725.
Court of Appeal of Louisiana, Fourth Circuit.
February 23, 1995.
*1228 John W. Hite, III, Sessions & Fishman, L.L.P., New Orleans, for defendant/appellee.
Clement F. Perschall, Jr., Metairie, for plaintiff/appellant.
Before LOBRANO, WALTZER and MURRAY, JJ.
LOBRANO, Judge.
Plaintiffs, Angel David and Jackie Kehoe, appeal the trial court judgment which rejected their claims against First National Bank of Commerce (FNBC) for the alleged wrongful dishonor of two checks drawn by it against its account at Citicorp Bank in New York. The facts leading to this litigation are as follows:
At some time prior to January 3, 1992, plaintiffs, Jackie Kehoe, and her daughter, Angel David, loaned money to Kim Moisant, a woman they had met through a mutual friend. Because other checks given to them by Moisant for repayment of these loans had been returned for insufficient funds, Kehoe decided to accompany Moisant to the FNBC Severn branch on January 3, 1992 so Moisant could buy cashier's checks from the bank and repay Kehoe and David with cashier's checks rather than with her own personal checks.
Moisant's friend, Kristie Farrington, also went to the bank with Moisant and Kehoe. When they arrived at the FNBC Severn branch, Moisant and Farrington went into the bank but Kehoe remained outside in her car. Moisant and Farrington emerged from the bank with two FNBC checks, each clearly labeled "Official Check." One was made payable to Kehoe for $5,011.85 and the other was payable to David for $1,200.00. On both checks, the remitter was listed as Clara Wolfrum.[1]
The check used to purchase the two official checks from FNBC was drawn on the account of Clara Wolfrum and was made payable to Kristie Farrington. The evidence at trial established that Wolfrum's signature on the check was forged and that some of Wolfrum's checks had been stolen from the home of her daughter, Marlene Hussey, who handled Mrs. Wolfrum's financial affairs. Mrs. Hussey testified that Moisant and Farrington were friends of her daughter. The check drawn on Mrs. Wolfrum's account was in the amount of $6,884.80, out of which Farrington and/or Moisant were issued the two FNBC official checks and $662.95 in cash. The remaining $10.00 covered bank fees for the official checks.
*1229 Farrington signed applications for the official checks issued to Kehoe and David. Although at least one of the applications indicates that Farrington requested a cashier's check, both the applications and the check drawn on Wolfrum's account which was given to FNBC by Farrington clearly stated that the checks issued to her were official checks and that they were being issued in lieu of the check drawn on Wolfrum's account.
The teller at the FNBC Severn branch who handled the official check transactions for Farrington and Moisant admitted that she did not check the signature card on Wolfrum's account but only checked to make sure there were available funds in Wolfrum's account to cover the check drawn on her account. Later that same day, Kehoe deposited the official check made payable to her in her account at Schwegmann Bank. She received a call from an employee of Schwegmann Bank that evening notifying her that a "stop payment" order had been placed on the official check by FNBC. Kehoe testified at trial that she did not know Clara Wolfrum and did not notice that Wolfrum was listed as the remitter on the official check.
Also on the same date, David deposited the official check payable to her at the FNBC Kenner branch where she banked. Of the $1,200.00 amount of the official check, David deposited $1,100.00 and received $100.00 cash. David testified that on that same evening, someone from FNBC called her to notify her that the official check she deposited was being dishonored by FNBC. She admitted at trial that the $1,100.00 was never actually deposited to her account by FNBC. David also stated that she did not know Clara Wolfrum and did not notice that her name was listed as the remitter on the official check.
The testimony of several FNBC employees from both the Severn and Kenner branches indicate that bank employees became aware that Wolfrum's check used to purchase the official checks was forged on the afternoon of January 3, 1992 shortly after David deposited her official check at the Kenner branch. One of the tellers noticed that the remitter listed on the official check, Clara Wolfrum, was the same person whose signature was on a check brought in earlier that day to the Kenner branch by two women. The teller at the Kenner Branch who had helped the two women, checked the signature card on Wolfrum's account and suspected that the check was forged. While the two women waited, the teller called Mrs. Wolfrum. However, she could not effectively communicate with Mrs. Wolfrum which was evidently due to Wolfrum's hearing problems which were disclosed by her daughter at trial. Because she could not conclusively establish that the check was forged but was suspicious that it might be, the teller told the women she would not cash the check and marked it "Do Not Cash." When questioned by the teller, the women said Wolfrum was their grandmother so the teller suggested that they get another check from her.
After David deposited the official check at that same branch later that day, the teller who helped David saw Clara Wolfrum listed as the remitter and recalled the problem that the other teller had earlier in the day with a check drawn on Wolfrum's account. Someone at the Kenner branch then called the Severn branch where the official check had been issued. After explaining the events leading to this call, an employee at the Severn branch realized that the check which was used to purchase the official checks had been forged. Both plaintiffs were notified of the fact that the official checks were being dishonored on the same day that the official checks had been issued by FNBC and deposited by plaintiffs.
Wolfrum's daughter, Marlene Hussey, testified that she received a call from her mother on January 3, 1992 informing her that an FNBC employee had called her about a problem with one of her checks. Hussey was unsure about what happened so she went to the FNBC Severn branch that same day. When she saw the check in question, she informed the bank that the signature on the check payable to Kristie Farrington (the one used to purchase the official checks) was not that of her mother. The teller supervisor at the FNBC Severn branch testified that Mrs. Hussey told her that day that some of her mother's checks had been stolen.
*1230 Plaintiffs assign and argue six errors by the trial court. The essence of those arguments is as follows. First they complain that since they are holders in due course, FNBC's defense of failure of consideration is not applicable. Second, they argue that the checks issued by FNBC were cashier's checks and that FNBC had no legal right to stop payment. Plaintiffs' claims are based on the obligation incurred by FNBC as evidenced by the two checks and on FNBC's wrongful stopping the payment of those checks.
Initially we observe that by Acts 1992, No. 1133 Louisiana Commercial Laws were amended and reenacted with an effective date of January 1, 1994. Because the transactions at issue in this case occurred in 1992, we apply the law in existence at that time. Therefore, unless otherwise indicated, all cites in this opinion are to the prior law.
We also note that factually, this case is not a situation where FNBC is seeking a refund or charge-back of an item that has already been settled or accepted. The stop payment order issued by FNBC prevented acceptance by its drawee bank, Citicorp. Even though David presented her check for deposit at FNBC, there was no settlement of that item. At best, there was a provisional settlement. See, La.R.S. 10:4-212.
The trial judge found that plaintiffs were not holders in due course of the Official Checks because the designation of Mrs. Wolfrum, rather than Moisant, as the remitter was a material alteration. Plaintiffs strenuously argue that this was error, and that the remitter designation is not a material alteration of the checks so as to destroy their status as holders in due course. Because of the result we reach, we need not address the correctness of this holding.
Louisiana Revised Statute 10:3-305(2)(b) provides that a holder in due course takes an instrument free from all defenses except "such other incapacity, or duress, or illegality of the transaction, as renders the obligation an absolute nullity." (emphasis added) Those defenses are sometimes called "real defenses."[2] Civil Code article 1966 provides that "an obligation cannot exist without a lawful cause." A cause is deemed unlawful when "the enforcement of the obligation would produce a result prohibited by law or against public policy." La.C.C. art. 1968. When the object of a contract violates a rule of public order, it is absolutely null. La.C.C. art. 2320.
The evidence in this case convinces us that either Moisant or Farrington forged Mrs. Wolfrum's name on the stolen check. That check was payable to Farrington in the amount of $6,884.80. Wolfrum's check was then used to obtain the two Official checks payable to the plaintiffs totalling $6,211.85. The remainder of Wolfrum's check, after bank fees, $662.95, was paid to Moisant or Farrington in cash. At that point in time at least three criminal acts had occurred, namely theft (R.S. 14:67), bank fraud (R.S. 14:71.1), and forgery (R.S. 14:72).[3]

FNBC'S OBLIGATION
A check is an authorization by the drawer to his or her bank to pay a sum certain to the payee or his order. A check evidences an obligation between its maker and the payee, the object of which is the payment of funds. Both the application for the Official Checks and the back of the forged Wolfrum check state that the Official Checks were issued in lieu of the Wolfrum check. In effect, the obligation incurred by FNBC on its Official Checks was substituted for the obligation evidenced by the forged check. And the object of the forged check was to illegally obtain funds from Mrs. Wolfrum's account. It is our opinion that enforcement of FNBC's obligation on the Official Checks would, in effect, be enforcement of the illegal obligations of the forged check.
Plaintiffs argue, however, that the Official Checks were not issued in lieu of the forged check. They assert that the forged check *1231 was accepted by FNBC and that its proceeds were used to purchase the Official Checks. Under those circumstances, they contend that valid consideration was given for the Official Checks and that FNBC cannot now refuse to honor its obligation to pay them. We disagree. Whether FNBC's Official Checks were issued in lieu of the forged check or purchased by the forged check, the fact remains that the object of those checks is the payment of funds illegally obtained. In either case, the result would be the same. This court's enforcement of FNBC's obligation would be perpetuating the theft by Moisant and/or Farrington of Mrs. Wolfrum's funds. Theft is against the public order, and any contract that seeks to perpetuate, assist or condone a theft is an absolute nullity.

STOP PAYMENT ORDER
Plaintiffs further contend that the Official Checks issued by FNBC are cashier's checks on which payment cannot be stopped. FNBC agrees that a stop payment order cannot be issued against a cashier's check; however, they argue that the checks in question are not cashier's checks. We agree. A cashier's check is a check drawn by a bank on itself. That is, both the drawer and drawee are the same. First Financial L.S.L.A. v. First American Bank & Trust Co., 489 So.2d 388 (La.App. 5th Cir.1986), writ denied, 492 So.2d 1217 (La.1986).[4] The checks issued by FNBC in the instant case were drawn on FNBC's account at Citicorp. Thus, the drawee bank is different. Under current law such a check would be a "teller's check." See, La.R.S. 10:3-104(h).
A cashier's check is not susceptible to a stop payment order because its acceptance for payment is simultaneous with its issuance. That is, the fact that the drawer orders payment on itself represents immediate acceptance of the check and thus its payment cannot be stopped. In contrast, payment of a check drawn on another bank can be stopped at any time prior to acceptance by the drawee bank. Of course, once it is honored by the drawee bank, a stop payment order is worthless. See, Guaranty Federal Savings Bank v. Horseshoe Operating Company, 793 S.W.2d 652, 655 n. 5 (Tex. 1990). Thus, in the instant case, FNBC was free to stop payment at any time prior to the checks being accepted by Citicorp. It did just that and plaintiffs cannot complain.

FEDERAL REGULATIONS
Finally, plaintiffs argue that FNBC failed to comply with 12 U.S.C. § 4001 et seq. and 12 C.F.R. § 229.1 et seq., known as Regulation CC and is liable to plaintiffs for this reason. The Expedited Funds Availability Act, 12 U.S.C. § 4001 et seq., is the enabling legislation for Regulation CC which was issued to implement this Act. Plaintiffs cite 12 U.S.C. § 4002(a)(2)(F) which states as follows:
Funds deposited in an account at a depository institution by check shall be available for withdrawal not later than the business day after the business day on which such funds are deposited in the case of
(F) a cashier's check, certified check, teller's check, or depository check which
(i) is deposited in a receiving depository institution which is staffed by individuals employed by such institution;
(ii) is deposited with a special deposit slip which indicates it is a cashier's check, certified check, teller's check, or depository check, as the case may be; and
(iii) is endorsed only by the person to whom it was issued.
It is undisputed that special deposit slips were not used by plaintiffs to deposit the official checks. However, the main reason the federal regulations cited by plaintiffs do not apply is that even though the official checks had been received for deposit by both FNBC and Schwegmann Bank, settlement of these checks was not effected at the time of the attempted deposits or at any time thereafter and the funds were never actually deposited *1232 to either of plaintiffs' respective accounts. Although plaintiffs attempted to deposit the official checks, they were dishonored before they had been processed or cleared by any of the banks.
The applications for the official checks clearly stated that these checks were being issued in lieu of the Wolfrum check. When it was discovered by FNBC, on that same day, that the Wolfrum check used to purchase the official checks had been forged, payment was immediately stopped on the official checks which had not yet been settled by FNBC and its drawee bank, Citicorp. Thus, the federal regulations cited by plaintiffs do not apply in this case.
For the reasons stated above, the trial court judgment is affirmed.
AFFIRMED.
NOTES
[1] On the check to David, Wolfrum's last name was incorrectly spelled Jolfrum.
[2] See the comments to the current version of La.R.S. 10-3-305. The current statute refers to the "illegality of the transaction" in terms of nullity "under other law" rather than absolute nullity.
[3] The evidence strongly suggests that the stolen check was taken from the desk of Mrs. Wolfrum's daughter, Marlene Hussey, evidencing another crime, simple burglary (R.S. 14:62).
[4] Although there was no statutory definition of a cashier's check in the prior law, current La.R.S. 10:3-104 provides that a cashier's check is a draft "with respect to which the drawer and drawee are the same bank or branches of the same bank."